Good morning, Your Honors, and may it please the Court, I am Steve Novak. I'm arguing on behalf of Bankers Life. Your Honors, bankers hired CBRE to help it decide whether and on what terms it would sublease its existing space and move to a new space. After the arbitration hearing, the arbitration panel found that CBRE made a $3.1 million calculation mistake on which bankers relied in subleasing and moving. Based on those findings, if CBRE had not made its own $3.1 million mistake, the deal would not have gone forward, CBRE would not have received the over $4.5 million in commissions that it got, and which it got only because of its own mistake. Nevertheless, the panel rejected bankers' claims and awarded it nothing. Instead, it awarded CBRE over $1.3 million in attorney's fees. We challenged this in the District Court. The District Court rejected that challenge and confirmed the award. This Court reviews that District Court decision de novo and reviews the arbitration award, the key standards here, under the Illinois Arbitration Act, not the FAA. Under the FAA, an award must be vacated if the arbitrator has exceeded their authority. Now, neither party has cited any case from this Court, and we're not aware of any case that this Court has considered, dealing with or setting forth the standard for when arbitrators exceed their authority under the Illinois Arbitration Act. However, Illinois courts have done so, and those standards are different than the FAA's. Relevant here, the IAA, as applied by the Illinois Supreme Court and Illinois Appellate Courts, provides that arbitrators exceed their authority in any one of three circumstances. First, where the arbitrator's construction of the party's contract was not possible under a fair interpretation of the contract. Second, where the arbitrator's ignored or changed the contract's terms. Or third, where the arbitration award contains gross errors of law or fact that are apparent on the face of the award. Well, it's that theme that you're looking at, isn't it? The gross error, gross mistake, based on the, I guess it's the IAA as opposed to the FAA? That's correct, Your Honor. That's the distinction that gives you the claim that it should have been labeled a gross mistake or whatever. Therefore, it should be on its face. Is that right? That's correct, Judge. Actually, we're arguing, and I think it's correct, I know it's correct, that all three of those standards are present. Any one of which requires vacater, all three are present. Here, the arbitrator panel wrongly rewrote the listing agreement three separate times. Banker's breach of contract claim was based on paragraph 20 of the party's CBRE to answer bankers' questions relating to, I'm going to underscore those words, relating to offers and counteroffers. And the CBRE admitted at the hearing it had to answer those questions, of course, accurately. Now, the vehicles through which CBRE purported to answer bankers' questions were the various CBAs that it submitted to bankers leading up to the $3.1 million mistake. And bankers claimed that this was a breach of CBRE's obligations to answer its questions accurately. The panel rejected that claim. However, the only reason the panel gave for that in the February award was because the CBAs were not offers or counteroffers. Well, it's true. Of course, it's true that the CBAs were not offers or counteroffers, but that's irrelevant. And that's because paragraph 20 did not require CBRE to provide accurate offers and counteroffers. A different paragraph required that. Instead, paragraph 20, the key paragraph here, required CBRE to provide accurate answers relating to offers and counteroffers. So by definition, the CBAs, which were the answers, had to be separate from the offers and counteroffers themselves. Was that $3.1 million for remodeling for the Groupon? Right. It was an expense for tenant improvement allowances that the underlying sublease deal would have required, did require, bankers to fund. And I guess you're just saying that CBRE, dealing with both sides, but negligently just left out 3.1 when it figured its calculation was $3.9 million? Right. It recognized the $3.1 million. In fact, it negotiated that. So it knew about it. It was in the backup documents. But somehow, when the model was inputted and everything was transposed, when it came to the summary page, which is the for the bottom line number, it needed somewhere around $7 million of net present savings to make this deal. When CBRE calculated that $7 million, it failed, arithmetically, if you will, to include the $3.1 million that it knew about and had already recorded in a different section. But nobody else noticed that, I guess. No one did. That's amazing. Well, I agree with that from CBRE's side, because they knew about it. We knew about it too, but we assumed, and we're relying on professionals that we're paying over $2 million to to make it right, that they would have included a known fact. This wasn't a projection or an opinion. It was a known fact. It was an arithmetic mistake. And by saying that, oh well, yes, we did make that mistake, but it was in a CBA. And since a CBA isn't an offer, we're not liable, that renders paragraph 20 meaningless. It writes paragraph 20 right out of the listing agreement. And when they did that, they either altered or ignored the listing agreement, or they interpreted it in a way that was not possible under a fair interpretation. But didn't your company review their calculations? No, no. The evidence was that they relied on the summary sheet calculations. There were some areas of input in the deal that our clients looked at, but that wasn't the evidence. And respectfully, while reliance is an element for a breach of contract, obviously we had to rely on the number that was mistaken. Reasonable reliance is not an element of breach of contract. It might be an element of negligent misrepresentation, which we also lost on, but which we chose not to appeal. What the arbitrator said in his June order was, the evidence was clear that bankers never simply took the accuracy of the CBA's cost-benefit analysis at face value. Its own personnel reviewed the CBA's independently, in accordance with the terms of the disclaimer. The panel notes that bankers' own personnel did not discover the error at the time the transaction was completed. Is that correct? I believe the panel did make that finding, and if my recollection is right, that was in the negligent misrepresentation section, where reasonable reliance is a factor. And the panel found, observed, that bankers had reviewed it and missed it as well as the other. But there's no contributory negligence or anything akin to it in a breach of contract action. And so while that was one of the grounds on which our negligent misrepresentation claim was rejected, we have not appealed from that. Consistent with the limited review that's available under the Illinois Arbitration Act, we've appealed only from the breach of contract action. And we're entitled, a client paying millions of dollars to a professional who holds itself out as being able to do this. And the panel also recognized that the only reason we brought CBRE in and the reason for reliance on them is because of their expertise. They tell us that the calculation is $7 million. That's what we see on the summary sheet. We are not obligated to go behind that. But you did. And the June order that Judge Posner was referring to has nothing to do with the tort claims. It's limited to the contract claim. Well, I'm sorry if I misspoke about that. I remember the June order as being dealing with the disclaimer. Bankers now ask the panel to reconsider its decision as to the contract count only. Well, if that's where that appears, then obviously that's correct. But there is no element of reasonable reliance under breach of contract law under Illinois. And that would be a gross error of law appearing right on the face, if that's where it appears,  But your problem is, it seems to me, is that the district court only looked at the FAA, saying, well, FAA and IAA are the same. And I think your position is they're not the same because the IAA can scrutinize on the basis of a gross mistake. I think that's what you're trying to say. That is correct. The district court recognized that this was a case under the IAA, but then went on to analyze it under the FAA. The FAA requires only that there have been an interpretation. That interpretation, in the words of this court, can be wrong, can be really wrong, can be grossly wrong. But as long as the arbitrators interpret the contract, then the court will not interfere with that. So what would be different under the IAA? And under the IAA, the construction, the interpretation that is made has to be reasonable and it cannot be an interpretation that, under any possible analysis, is not possible under the contract. And to say that the answers have to be the counteroffer or the offer itself, as opposed to relating to, is a completely, is an interpretation that can't possibly be gleaned from that document. Well, unfortunately this is, if the IAA standard would look at this, what I want to say is an obvious mistake, but it wasn't obvious apparently because everybody overlooked it. And that, based on that, this whole thing should be resurrected. And I guess, what, vacate? Is that what you want? Yes. It's not the $3.1 million mistake that we say is the gross error factor law. The gross error factor law here, and the misreading of the contract, is by the panel, not by CBRE. The panel, in trying to say, it doesn't matter that that $3.1 million mistake was made, misread the contract to get there. And it interpreted the contract in a way that's not possible. Because the contract doesn't say that they have to give us a truthful offer. They say that the answers about the offer have to be truthful. Well, you say everybody was aware of the mistake. No, I say nobody was aware of the mistake. I mean, when it got to the arbitration. That's correct. This was pointed out. That's correct. And they, for whatever reason, said that it didn't matter or something. I'm not sure what the contract... I know the district court said it's a contract interpretation and when an arbitrator makes an interpretation of a contract, even if it's wrong, the court doesn't have the authority to overrule it. And yet, you're saying that internally, how could that panel, I guess the panel of the arbitration, overlook this and not say that this is a gross mistake and therefore they should not have approved it. I guess it's a glaring error and yet the only error that may be there is the wrong application of the wrong standard. And I don't know how we argue that, how you argue that. Because that's what it comes down to. It's not a misinterpretation of the contract. Well, it was a misinterpretation of the contract by the arbitration panel. Wait a minute. The contract said it had to be accurate? Is that what you're trying to say? Right. And the panel ultimately agreed. The panel in the June award that Judge Sykes referred to said basically we were wrong when we said that about paragraph 20. And then the June award went ahead and misread the contract another two times. So we end up having three misreadings. And as you surely saw from the response, CBRE doesn't even try to defend that June award. So it's left with the February award, which has one and only one reason, which the panel admitted was wrong. So that's why the district court should have, and why we asked this court to do so, should have vacated it under the standard of the Illinois Arbitration Act. Not the federal act, under Hill. No matter how bad that interpretation is, you can't vacate. But under Illinois, not so. If it's not a possible interpretation, and the panel admitted it was wrong in the February award, then it must be vacated. That's a completely different standard. Okay. Thank you, Mr. Novak. Thank you, Your Honors. Mr. O'Connell? May it please the court? Counsel? Your Honors, two things up front. Number one, you don't have to decide whether Illinois law or federal law applies in this matter. CBRE prevails under any one of those, any interpretation at all.  and the other cases, but I just want to say that in the Hedrick case, in the first Merritt case that counsel has trotted out to support its position. Judge Wein and Weber, whose opinion you are reviewing de novo, cited to Illinois law and said Illinois law, the Rexner case, basically says Illinois and federal law are the same, they're parallel, their origins are the same, and then he goes on, and he does happen to cite from Hill v. Norfolk, but then he goes on and says, guess what? Bankers made this arbitration agreement, agreed to abide by it, and they lost. And that's what we really are here about, Your Honors, and we filed a motion for sanctions and I recognize it's extreme, but at this point, you've got a commercial arbitration between two very sophisticated parties with sophisticated counsel, they agreed to arbitrate, binding arbitration, and let me tell you about that arbitration. Three very high caliber judges, former judges, were the arbitrators. Julia Nowicki, 22 years on the circuit court, Wayne Anderson, 7, 8, 20 years on the federal district court, Clifford Meacham, 19 years on the circuit court, they were chosen by the parties. These arbitrators conducted a hearing over the course of three days, they listened to 11 witnesses, they took documents, and they had separate closing arguments several days later. They afforded these parties a full and fair hearing as is required under the GM's rules. Then, they issued a 13-page written opinion wherein they detailed how they came up with what they did and you can follow their interpretive analysis very clearly, just like it's written about in the CUNA manufacturing case, your honors. How did they just deal with the 3.1 million? They recognized it was a mistake, I think, didn't they? Oh, CBRE recognized that right before the claim was even filed. That was in these separate documents that are given to have the client look at, well, if we sublease here and we move there, what's the potential we can make? What's the net present value of our projected, you know, what those CBAs were about? They say, you know, you sublet to Groupon here, you move to 111 North State, you move over here, you move, and it's all those comparisons, all right? It's a guidance document, which is why in the beginning, we said the very best thing that bankers could hope to have here is negligent misrepresentation, but of course there is no negligent misrepresentation because bankers itself had a group of financiers reviewing these CBAs. They are the ones who entered into the sublease with Groupon that had the 3.1 million tenant improvement allowance in it. They signed it. Okay, so everybody missed it. There was no reliance. The arbitrators determined there was no reliance. But it's, respectfully, it's not the job of this court to go down and reinterpret the arbitrator's decision. That's that, why have arbitration then if this is what we're going to do? It's now three years since this claim was filed. It's a year and a half since the arbitrators ruled. Judge Lyon-Weber read the briefs. There was a motion to reconsider. He denied it. This is the fourth time we're going over this case, and is it really your honors, is it a good use of your time to be reassessing what these three reputable judges decided when they listed it out? And I'd like to point out one other thing here, and this is another reason for the sanctions. I mean, the sanctions because there's no reasonable expectation that bankers can prevail here. There just isn't. This is an ironclad arbitration decision. But one of the other... I don't understand the second arbitration order, its reference to the disclaimer. The disclaimer wasn't part of the contract. Here's what happened in that second order, Judge. And it's not an award, by the way. It's not part of the award, despite Bankers Council referring to it as an award. It was an order that specifically said, this doesn't change our award. What happened in that situation, bankers asked for rehearing, and I remember very well, Judge Nowicki said, well, wait a minute. If you're saying the answers to the questions are these big documents, these CBAs, they have a disclaimer on them anyway, right? And the response was, yes. So, in my view, it was, well, you know, look, even if those were the answers, there's this disclaimer on them anyway, so you know you can't rely on those. But to say they're part of the contract in the first instance was wrong, and we took issue with that in front of Lionel and others as well. But I thought the other side, your opponent, didn't know about the disclaimer, hadn't agreed to it. They were poring over these agreements all the time, Your Honor. The CBAs, remember, under the award, are not part of the contract. So this disclaimer issue is just, that's a something else. That was unilateral. That's their only argument. Whoever put that disclaimer, it was one-sided. It wasn't negotiated. It's not part of the contract. It didn't need to be negotiated. That order is not part of the award in this case. These were guidance documents. These were what? Guidance documents. Big piles of guidance documents with all of these financials. If you move here, here's what you're going to pay in tenant improvement. Here's the HVAC. Here's the electricity. Columns and columns and columns. And CBRE prepares these to assist clients in deciding what they're going to do. And bankers got three of their financial people together to review these. And they reviewed them in detail. And that's what the evidence showed. I mean, frankly, the case should not have been filed at all. And it's certainly not a breach of contract situation, Your Honors. So what I'd like to get back to is the fact that you don't need to decide. You can look at any of the cases that have been cited in these briefs, and CBRE still prevails. But are you saying that the document that we have that has the disclaimer, they did see it, the other side? They poured over these documents all the time, repeatedly, over months and months. So they were aware of that. Okay. Well, thank you very much. Thank you, Your Honors. And Mr. Novak, do you have anything further? I would like to very quickly. Number one, we're hearing it again. If the June order is not a part of the award, which you just heard counsel say, they are left then with the February award. The February award is required to be reasoned. The parties agreed to that. The only reason the panel gave in the February award... But when your clients saw this document with the disclaimer at the bottom, did they protest? Did they say, we're not going to let you disclaim responsibility for mistakes? No. Your Honor, the evidence was uniformly that nobody from CBR, from bankers... Well, Ms. McDonald said that your people, your clients, poured over these documents, which were not part of the contract, but which did have this disclaimer. So what did they think when they saw the disclaimer? Well, I'd like to ask the court to look at that disclaimer and ask you what you think. I know what the disclaimer says. I'm saying, what was the reaction of the... of your client to the disclaimer? They were given the document. They did not see the disclaimer. And if you look at the record, look in the record... This document with the disclaimer wasn't shown to them? No, the document was. Well, then how did they miss the disclaimer? They missed it because if you look in the record at it, don't look at the brief's description of it, because in the very, very small print at the bottom, and they just didn't see it. You can't see it. And they didn't see it. You can see it. Of course you can see it. And if they're deemed to have seen it, then they're deemed to be able to take advantage of the limitations. We obtained the information above from sources we believe to be reliable, etc. I don't have the greatest vision actually, but I can read it. I can peer at it. You think that people going out... People would be... You say it's too fine to read, but I would think anyone looking at this would see this fine print at the bottom and be very curious. What is this? Well, Your Honor, if they're deemed to have seen it, because they got it even though they said they didn't. If they're deemed to have seen it, then we get the benefit of the language of that disclaimer. And that disclaimer only disclaims three types of errors, none of which is involved in our case. Legal advice, tax advice, information received from third parties, or information about the performance of the property. Those are the three disclaimers, and they don't apply here. Even if our clients had read that disclaimer, which they testified they did not, because they looked at the numbers that were on that summary sheet. That's what they were looking for. They spent months trying to see if this would generate $7 million of savings. That's all they cared about. You're not interpreting the disclaimer correctly. It says we include projections, opinions, assumptions, or confirmation for example only, and they may not represent current or future performance of the property. You and your... This is hard to read. You and your something and legal advisors should conduct your own investigation of the property and transaction. It's pretty clear. Well Judge, it's prefaced. It's prefaced by information received from sources, from third party sources. The $3.1 million expense was not obtained from any third party source. CBRE negotiated that term itself. With respect to future performance of the property, we're not complaining about anything they said to us about future performance of the property. They didn't even tell us about the property or any future performance of it. They only talked about our lease and what the financial ramifications were and all we cared about... The critical sentence is we include projections, opinions, assumptions, or estimation for example only and they may not represent current or future performance of the property. But they are promising to give us what they believe is their best projection. They left $3.1 million that they knew about. I know, but they're afraid they may be mistaken so they include the disclaimer. But they don't have a disclaimer about arithmetic mistakes. Of course they do. They say projections, right? We're not fighting about a projection here, Judge. Yes, projections are arithmetical estimations of the value of the property. With all respect, if you have a known... No, no, that's not right. It's not English. This is a premeditated issue on remodeling up front. I mean, I assume Groupon did a lot of remodeling. I thought that's what the $3.1 million is being represented. Is that wrong? That number was agreed to in advance. And bankers agreed. Bankers agreed. We don't deny it. We agreed to pay or allow them $3.1 million of a rent concession for tenant improvements. So that's a fixed number going in. That's a fixed number going in. We knew about the number, but we thought... Everybody agreed to that. And a client who hires a professional to take those known numbers and then tell you what it means, the client's entitled to believe that the professional took that number into account. And we didn't see it. The finding by the panel wasn't that when we poured over, allegedly, that we saw the mistake. We didn't see it. They didn't see it. Well, who should bear the burden? The professional who's getting $4.5 million out of the deal or the client who's paying the professional for their advice? Who should bear the burden of a mistake that neither side saw? When the contract required them to give an accurate... The client, of course, is much more at stake than the advisor. Well, then why did we... We hired the advisor for a reason. Sure, you hired them. That doesn't mean you accept uncritically what they tell you. You're supposed to use your own judgment. Not...judge with all respect. Not when the client...when the contracting party is the professional. You're a professional. Your company is a professional. Come on. Pardon? Your company is professional. It's not some consumer. Some... Well, that just means that we have to double-check what our professional does. Yes, it does. And I don't think that's... Under Illinois law, I don't think... Okay, well, thank you very much to Mr. Novak and, of course, Ms. McConnell.